## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JANETTE BARR-RHODERICK**,
as legal guardian and next friend of
Christina Janette May, a minor,
**ANGELICA TERRAZAS**, as parent
and next friend of Astolfo Terrazas,
a dependent person, and
for similarly situated students,

       Plaintiffs,

    vs.                          No. CIV 04-0327 MCA/ACT

**THE BOARD OF EDUCATION OF
ALBUQUERQUE PUBLIC SCHOOLS**,
**BETH EVERITT**, as Superintendent of Schools,
**DEBI HINES**, as Director of Special Education,
**NANCY KILPATRICK**, **RON WILLIAMS**,
as former Directors of Special Education,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the following motions:  (1) the

*Individual Defendants' Motion for Summary Judgment* [Doc. 145] filed on November 10,

2005; (2) *Defendant APS' Motion for Summary Judgment* [Doc. 147] filed on November 10,

2005; and (3) *Plaintiffs' Consolidated Motions 1) for Partial Summary Judgment Against*

*Defendant APS and 2) to Alter or Amend Order of Partial Summary Judgment for Defendant*

*APS* [Doc. 149] filed on November 10, 2005.  Having considered the parties' submissions,

the relevant law, and otherwise being fully advised in the premises, the Court determines that

all Defendants are entitled to summary judgment on Plaintiffs' constitutional claims under 42 U.S.C.§ 1983 and that Defendant APS is entitled to partial summary judgment limiting the scope and duration of Plaintiffs' statutory claims under the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act, and Title II of the Americans with Disabilities Act (ADA).  I further determine that Plaintiffs have not shown any basis to alter or amend the Court's prior rulings in this matter, nor are Plaintiffs entitled to partial summary judgment on any aspect of their remaining statutory claims at this juncture. Accordingly, the *Individual Defendants' Motion for Summary Judgment* [Doc. 145] is granted, *Defendant APS' Motion for Summary Judgment* [Doc. 147] is granted in part and denied in part; and (3) *Plaintiffs' Consolidated Motions 1) for Partial Summary Judgment Against Defendant APS and 2) to Alter or Amend Order of Partial Summary Judgment for Defendant APS* [Doc. 149] are denied.  The result is that Plaintiffs' statutory claims against Defendant APS for declaratory and equitable relief from the 2000-2001 school year forward are the only remaining claims in this action.

## I.    **BACKGROUND**

The history of this litigation is set forth in previous rulings filed on January 28, 2005; March 31, 2005; and September 30, 2005.  [Doc. 58, 78, 121.]  Since those rulings were issued, the parties were afforded the opportunity to conduct additional discovery [Doc. 91, 155], and to file another round of dispositive motions [Doc. 138] directed at the allegations in Plaintiffs' *Second Amended Complaint* [Doc. 79].

The gist of Plaintiffs' *Second Amended Complaint* is that they and other special-education students enrolled in Defendant APS's "intensive support programs" (ISP) or "behavior intervention programs" (BIP) were not provided with a "full school day" in comparison to other APS students, and that this lack of a full school day was not justified by an individualized determination of each student's educational needs. [Doc. 79.] The evidence of record reflects that the parties have used different methods to measure and define what constitutes a "full school day."

One way to measure the length of the school day is by means of "bell schedules" which determine the time at which students are required to start their school day and the time at which students are dismissed from school each day. Under this method, the length of the school day refers to the total amount of time that the student is required to spend on the school campus each day, without regard to how much of that time is occupied by activities such as lunch, recess, and passing periods. Plaintiffs assert that bell schedules provide the best method of measuring the length of the school day because this method accounts for the fact that students may receive educational benefits while on the school campus even when they are not technically receiving instruction from a teacher or therapist.

The evidence of record indicates that APS's bell schedules are determined on a site-specific basis by principals or other supervisory personnel at each school. [Kilpatrick Dep., Ex. G to Doc. 146, at 41; Kilpatrick Aff., Ex. H to Doc. 146, at 1-2; Hines Dep., Ex. I to Doc. 146, at 91; 128; Williams Dep., Ex. 3 to Doc. 161, at 40; Everitt Dep., Ex. 11 to Doc. 161, at 68-69; Hines Aff., Ex. F to Doc. 22, at 1-2.] Thus, there are variations in bell

schedules from school to school and from year to year.  [Ex. 4, 6 to Doc. 161; Ex. 5 to Doc.. 160; Evans Dep., Ex. 12 to Doc. 161, at 17-25.]

In 1988, there was a series of correspondence between APS and the State of New Mexico's Department of Education concerning alleged "discrepancies" in the length of the school day for special-education students when compared to regular-education students at certain schools within the APS system.  [Ex. 4 to Doc. 161.]  The 1988 correspondence, in turn, referenced technical assistance that APS received from the Office of Civil Rights (OCR) of the United States Department of Education in 1984.  According to APS's understanding of that technical assistance as reflected in the 1988 correspondence, the length of the school day could be measured by "instructional time" rather than bell schedules in some instances.   Indeed, the OCR's letter to APS dated February 24, 1984, interprets Section 504's implementing regulations as requiring "the local educational agency [to] provide handicapped students with *instructional time* which is equal to that provided to their non-handicapped peers unless their individual educational needs justify the provision of less *instructional time.*"  [Ex. I to Doc. 24 (emphasis added).]

Using "instructional time" as the method of calculating the length of the school day takes into account the fact that some disabled students receive instruction during lunch, recess, and passing periods, while their non-disabled peers do not receive instruction during these periods.  Thus, for example, where special-education students spend more time in class and less time in recess or passing periods during the school day in comparison to regular-education students, APS contends that the special-education students may in fact receive

more instructional time than the regular-education students even though the special-education students start school or are dismissed from school at different times than the regular-education students.  APS also notes that the use of instructional time to calculate the length of the school day allows the school district to accommodate other scheduling needs occasioned by safety concerns associated with school-bus traffic [Ex. C, D to Doc. 105] and teacher-planning periods during the school day, which are required under the school district's negotiated agreement with the teachers [Vigil memorandum dated Jan. 2, 2003, Ex. 7 to Doc. 39.]

A third way of measuring the length of a special-education student's school day is by reference to the "Individualized Education Program" (IEP) for that student prepared in accordance with the requirements of the IDEA.  IEPs are reviewed and subject to revision on at least an annual basis and, thus, may vary from year to year.  Since they are required to be "individualized," IEPs also vary from student to student.

IEPs for some special-education students, including the Plaintiffs in this case, may call for instruction on skills such as eating meals and using the bathroom which, for regular-education students, normally occur during lunch and passing periods.  [Ex. 2-7 to Doc. 88; Legler Aff., Ex. E to Doc. 22.]  Thus, at one time APS officials took the view that lunch and passing periods can be counted as "instructional time" for special-education students so long as their IEPs call for them to receive instruction on activities which normally take place during lunch and passing periods.  Insofar as lunch and passing periods for regular-education students are not counted as "instructional time," APS draws the inference that special-

education students can receive an equivalent school day (in terms of instructional time) even though they start school later or leave the school grounds earlier than regular-education students.

The technical assistance that APS received from the OCR in the 1980s is somewhat ambiguous on this point, as there are letters from OCR during this period indicating that: "If a child's IEP includes instructional goals and objectives regarding skills that can be developed during lunch or recess and if appropriate instruction is provided to the child during that time, lunch or recess may be considered instructional time in those individual cases." [Letter to Lewis dated Aug. 15, 1986, attached as unnumbered exhibit to Doc. 34.]  While this guidance references the content of a student's IEP, it lacks clarity with respect to whether the language in the IEP itself must expressly call for a shortened school day or whether school officials may make a more generalized inference that all IEPs which call for instruction on skills that can be developed during lunch and recess periods implicitly permit school officials to count lunch and recess periods in calculating the length of the school day for the category of students with such IEPs.

On November 8, 2002, Defendant Hines issued a memorandum to all APS school principals that clarified this ambiguity and discontinued the policy using a generalized measurement of "instructional time" (including, in some instances, lunch or passing periods) as a justification for setting different bell schedules for special-education students, which resulted in less total time spent on the school campus each day.  [Ex. G to Doc. No. 22.] Defendant Hines' memorandum was followed by a memorandum from the State Department

of Education dated November 13, 2002, which cited more recent guidance from the OCR suggesting that shortened school days for disabled students are not permissible unless specifically called for in a student's IEP.  [Ex. 10 to Doc. 23.]

On January 2, 2003, another APS official, Joe Vigil, sent a follow-up memorandum expanding on the guidance provided by Defendant Hines and noting that schedule changes must accommodate both the need for parity between different categories of students and the need to comply with the negotiated agreement under which each teacher must be afforded a daily preparation period equal to one full class period during the instructional day. [Vigil memorandum dated Jan. 2, 2003, Ex. 7 to Doc. 39.] The following day, the State Department of Education issued another memorandum that further expanded on such guidance and rejected the notion of counting lunch and recess periods as a justification for shortening the school day where that justification is not expressly provided in a student's IEP.  [Ex. 11 to Doc. No. 23.]

In conjunction with Defendant Hines' memorandum of November 8, 2002, another APS employee conducted a survey of various APS schools with special-education programs to find out which schools had different bell schedules for these programs and to bring these schools into compliance with the guidance provided in that memorandum.  [Evans Dep., Ex. 12 to Doc. 161, at 17-25; Evans Aff., Ex. B to Doc. 98.]  The survey results are summarized in tables prepared by that APS employee which are attached to Plaintiffs' response to Defendant APS's most recent motion for summary judgment. [Ex. 5 to Doc. 160.]  These tables indicate that some schools had different bell schedules for special-education students

while others did not, and that it took some schools longer than others to resolve this issue. For some of the schools with different bell schedules, there were some students for whom the reduced or shortened school day entailed by that schedule was specifically called for in the student's IEP [Ex. 6 to Doc. 161], while the record is silent as to the content of the IEPs for other students who were subjected to different bell schedules.[1]

## II.   ANALYSIS

### A.   Standards of Review

Both parties have filed motions for summary judgment in this case.  Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact, and that the moving party is entitled to judgment as a matter of law.  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).  A fact is "material" if it might affect the outcome of the case.  See id. at 248.

When the movant is also the party bearing the burden of persuasion on the claim for which he or she is seeking summary judgment, the movant must show that the record as a whole satisfies each essential element of his or her case and negates any affirmative defenses

---

[1]As of the time the pending dispositive motions were briefed, the parties had not yet completed their review of IEPs for students other than the named Plaintiffs in this action.  [Doc. 185.] Other students are not mentioned by name due to privacy concerns.

in such a way that no rational trier of fact could find for the non-moving party.  See 19 Solid Waste Dep't Mechanics v. City of Albuquerque, 156 F.3d 1068, 1071 (10th Cir.  1998); Newell v. Oxford Mgmt., Inc., 912 F.2d 793, 795 (5th Cir. 1990); United Missouri Bank of Kansas City, N.A. v. Gagel, 815 F. Supp. 387, 391 (D. Kan. 1993).  But when the movant does not bear the burden of proof as to the claim or defense at issue in the motion, then judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324.  "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'"  Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)).  Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion.  Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions).

In this case, the evidence of record includes a variety of correspondence from APS officials, the State Department of Education, and the OCR which may raise hearsay concerns. While the correspondence from APS may contain admissions by a party opponent under Fed. R. Evid. 801(d)(2), see Pastran v. K-Mart Corp., 210 F.3d 1201, 1203 n.1 (10th Cir. 2000), the correspondence from the State Department of Education and the OCR generally is not considered for the truth of the matter asserted, nor is it considered as an expression of binding legal precedent. Such correspondence from third parties may, however, be considered for other admissible purposes, such as showing its effect on the listener or the declarant's state of mind. See Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993) (effect on the listener); Wright v. Southland Corp., 187 F.3d 1287, 1304 n.21 (11th Cir. 1999) (declarant's state of mind); Pastran, 210 F.3d at 1203 n.1 (similar). This category of evidence also may be considered as verbal acts or operative facts when legal consequences flow from the utterance of the statements therein. See generally Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001).

Plaintiffs also have submitted additional evidence with their reply brief in support of their motion for partial summary judgment. [Ex. 1 through 6 to Doc. 164.] The general rule is that when a movant submits additional evidence in support of summary judgment after the filing of the non-movant's response, district courts have the option of either disregarding that additional evidence or providing the non-movant with the opportunity to file a surreply. See Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1163-65 (10th Cir. 1998). In this instance, I

elect to disregard the additional evidence submitted for the first time with Plaintiffs' reply brief, except to the extent that this evidence was already part of the record at the time Defendants filed their response brief [Doc. 157.]

Apart from the limitations noted above, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

Under the auspices of Fed. R. Civ. P. 59(e), Plaintiffs' motion [Doc. 149] also seeks to alter or amend the Court's prior ruling [Doc. 121] to the extent that it granted in part Defendants' motion for partial summary judgment as to Plaintiff Astolfo Terrazas based on a failure to exhaustion of administrative remedies [Doc. 87.] Grounds warranting relief under this Rule 59(e) "include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000) (citing Brumark Corp. v. Samson Resources Corp., 57 F.3d 941, 948 (10th Cir.1995)); see Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997). A motion under Fed. R. Civ. P. 59(e) does not, however, provide a valid basis "to revisit issues already addressed or advance arguments that could have been raised in prior briefing," or "to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts

which were available at the time of the original motion." <u>Servants of Paraclete</u>, 204 F.3d at

1012; <u>accord</u> 11 Wright, Miller & Kane, *Federal Practice and Procedure Civil 2d* § 2810.1,

at 127-28 (1995).

Ordinarily, motions to alter or amend under Fed. R. Civ. P. 59(e) are filed within ten

days of the entry of a final judgment. <u>See</u> <u>Phelps</u>, 122 F.3d at 1324. But the limitations on

granting relief under this rule do not necessarily apply to a motion filed before a final

judgment is entered, because the Court generally retains the authority to revise or clarify its

opinions granting or denying partial summary judgment prior to a trial or the filing of a final

judgment. <u>See</u> <u>FDIC v. Massingill</u>, 24 F.3d 768, 774 (5th Cir. 1994); 11 James Wm. Moore

et al., <u>Moore's Federal Practice</u> § 56.40[2], at 56-281 (3d ed. 2003).

## B.    <u>Clarification of the Court's Prior Ruling</u>

In the *Memorandum Opinion and Order* [Doc. 121] filed on September 30, 2005, the

Court granted Defendants' motion for partial summary judgment with respect to any aspect

of Plaintiff Astolfo Terrazas' claims that challenges the validity or appropriateness of the

language included in his IEPs. In particular, the Court pointed to language in this Plaintiff's

IEP dated January 7, 1999, which hypothetically addressed the possibility of providing an

"abbreviated day in the future in order to put  him on an individual bus run." [Ex. 4 to Doc.

88, at 2.]

Plaintiffs now seek clarification as to whether the Court's prior ruling on this issue

precludes all of Plaintiff Astolfo Terrazas' claims for the period during which the IEP dated

January 7, 1999, was in effect. I agree that such claims are not necessarily precluded by the

Court's prior rulings in this case.[2]  As previously noted, the IEP dated January 7, 1999, only addresses a hypothetical possibility; it does not specifically state that Defendants put Plaintiff Astolfo Terrazas on an abbreviated school day in order to accommodate an individual bus run, and there is no evidence currently before the Court as to whether such an individual bus run actually occurred during the period covered by this IEP.  Thus, the Court is not in a position to grant partial summary judgment for Defendants based on the proposition that any abbreviated school day that Plaintiff Astolfo Terrazas experienced during this period was the result of the individual bus run mentioned in his IEP.

On the other hand, if it were undisputed that such an individual bus run for this student did occur during the period covered by the IEP dated January 7, 1999, then Plaintiffs could not avoid summary judgment on this issue by attacking the validity or appropriateness of the language in the IEP which called for an individual bus run.  More generally, the Terrazas Plaintiffs may not attack the validity or appropriateness of *any* of their IEPs in this civil action because they have not exhausted their administrative remedies.

In their motion to alter or amend the Court's prior ruling, Plaintiffs disavow any attempt to mount such an attack on the IEPs themselves.   But their *Second Amended Complaint*, as well as Plaintiff Angelica Terrazas' deposition testimony, provide Defendants with good cause to question the sincerity of such disavowals.  Ms. Terrazas' deposition testimony indicates that she was dissatisfied with the IEP process itself, not just the

---

[2]Claims for the 1999-2000 school year are precluded, however, under the statute of limitations and the doctrine of laches, as discussed later in this *Memorandum Opinion and Order*.

shortened school day.  [Terrazas Dep., Ex. 1 to Doc. 161, at 4-6.]   And in Paragraph 37 of the *Second Amended Complaint*, Plaintiffs appear to question the validity of other students' IEPs by alleging that APS covertly counseled "parents of students in programs that their children would be 'better off' with a shortened school day to be recorded in IEPs for all children in the particular school's district program.   [Doc. 79, ¶ 37.]

This action is not the proper forum for such complaints about the validity or appropriateness of a particular student's IEPs, because (except for Plaintiff C.J. May) Plaintiffs have not shown that they exhausted the administrative remedies which are available for challenging the content of an IEP or the process by which a specific IEP was formulated. It was for this reason that the Court granted the portion of Defendants' prior motion seeking the dismissal of such challenges from this action.

In granting Defendants' motion in part, the Court did not enter a final judgment, nor did it specify that the claims subject to that ruling would be dismissed with prejudice.  Thus, there is no occasion to apply Fed. R. Civ. P. 59(e) at this time.  If and when a final judgment is entered in this case, the dismissal of such claims will be without prejudice because the failure to exhaust administrative remedies is jurisdictional, and a dismissal for lack of jurisdiction is without prejudice. See generally  Cudjoe v. Indep. Sch. Dist. No. 12, 297 F.3d 1058, 1063 (10th Cir. 2002).  Thus, while the Terrazas Plaintiffs (and other prospective class members who have not exhausted their administrative remedies) are precluded from bringing such claims in this action, they are not necessarily precluded from filing *another* action

challenging the validity or appropriateness of their IEPs *after* they exhaust their administrative remedies.

### C.    Plaintiffs' Constitutional Claims

As a result of the prior rulings which are clarified above, the scope of this action is limited to Plaintiffs' challenge to Defendants' alleged practice of reducing or shortening the school day for certain categories of special-education students based on systemic, school-wide policies (such as "bell schedules") rather than individualized determinations reflected in each student's IEP.  Plaintiffs contend that this practice violates several federal civil-rights statutes as well as their constitutional rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution.   I first address Plaintiffs' constitutional claims against all Defendants and then turn to Plaintiffs' statutory claims against Defendant APS under the IDEA, Section 504 of the Rehabilitation Act, and Title II of the ADA.

Plaintiffs' constitutional claims are before this Court by virtue of 42 U.S.C. § 1983, which provides a defense of qualified immunity to Defendants sued in their individual capacity unless it is shown that their actions violated a specific federal constitutional right and that the rights which they allegedly violated were clearly established at the time of the conduct at issue.  See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Medina v. City & County of Denver, 960

F.2d 1493, 1498 (10th Cir. 1992). But "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741, 745 (2002); accord Holland v. Harrington, 268 F.3d 1179, 1197 (10th Cir. 2001). The "salient question" is whether the state of the law at the time of the incident gave the individual defendants "fair warning" that their conduct was unconstitutional. Hope, 536 U.S. at 741.

Persons also may be sued in their individual capacity under a theory of supervisory liability. To establish supervisory liability under 42 U.S.C. § 1983, a plaintiff must demonstrate an affirmative link between the supervisor's conduct and the constitutional deprivation. See Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997); Holland, 268 F.3d at 1187. In particular, a plaintiff must show that the supervisor acquiesced in the constitutional violation through "'personal participation,'" her "exercise of control or direction," or her "failure to supervise." Id. (quoting Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir.1988)).

In addition to bringing suits against persons in their individual capacities under theories of personal or supervisory liability, 42 U.S.C. § 1983 allows for constitutional claims against certain types of institutional defendants, such as local school boards, under a theory of municipal liability. Under this theory, school boards can be held liable under 42 U.S.C. § 1983 only for their own unconstitutional or illegal policies, not for the tortious acts of their employees. See Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir.1998). In order to prevail on a claim under 42 U.S.C. § 1983 against a school board, a plaintiff must prove

-16-

(1) that an employee of the school board committed a constitutional violation, and (2) that a policy or custom of the school board was the "moving force" behind the constitutional deprivation. See Myers v. Okla. County Bd. of County Comm'rs, 151 F.3d 1313, 1316 (10th Cir. 1998).

When an official policy itself violates federal law, "issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question." Barney, 143 F.3d at 1307. Proving the existence of such an official policy also is relatively straightforward when that policy is expressly established by the school board's authorized decisionmaker, i.e., the person "responsible for establishing final policy [for the school board] with respect to the subject matter in question." Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) (plurality opinion). "If the decision to adopt [a] particular course of action is properly made by [the] government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." Id. at 481; see Lopez v. Lemaster, 172 F.3d 756, 763-64 (10th Cir. 1999). A school board also may be liable for constitutional deprivations "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978); see Pembaur, 475 U.S. at 481-82 n.10 (holding that the custom may be established by proof of knowledge and acquiescence).

Finally, a school board's liability also can be established through a theory of inadequate training or supervision. To prevail on such a theory, however, a plaintiff must

show that the failure to train or supervise amounts to "'deliberate indifference.'"  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1318 (10th Cir. 2002) (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)).  Such deliberate indifference may be shown when the school board "'has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.'"  Id. (quoting Barney, 143 F.3d at 1307).

In this case, I find it unnecessary to separately address each of the elements of Plaintiffs' theories of individual liability, supervisory liability, and municipal liability because there is one common element of these theories that Plaintiffs have failed to satisfy. Regardless of whether the conduct or practice at issue here is attributed to a person acting in an individual capacity, a person acting in a supervisory capacity, or an official policy or custom of the school board itself, Plaintiffs have not presented evidence which can support a reasonable inference that any of the Defendants violated either of the two federal constitutional rights that are asserted in this action.

### 1.    Plaintiffs' Equal Protection Claim

The first constitutional right that Plaintiffs assert is the right to equal protection under the law.  Plaintiffs assert that Defendants' actions violate the Equal Protection Clause of the Fourteenth Amendment because they treat certain categories of disabled students differently than their non-disabled peers.  Defendants respond that the categories of disabled students at issue here are not similarly situated to their non-disabled peers and that there is a rational basis for any differences in treatment.

-18-

The level of scrutiny that courts apply to equal-protection claims under the Fourteenth Amendment depends in part on whether those claims involve a suspect classification or a fundamental right. Under its equal-protection jurisprudence, the Supreme Court has rejected the notion that mental retardation or other immutable disabilities qualify as "quasi-suspect" classifications. Bd. of Trustees of the Univ. of Alabama v. Garrett, 531 U.S. 356, 366 (2001). The Supreme Court also has declined to recognize public education as a fundamental right that warrants heightened scrutiny under the Constitution. See Plyler v. Doe, 457 U.S. 202, 221 (1982). Accordingly, Plaintiffs' equal-protection claims do not trigger strict scrutiny, and the classification Plaintiffs challenge in this case will survive judicial scrutiny if there is any rational basis for it. See Garrett, 531 U.S. at 366-67; accord City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 442 (1985).

Determining the proper standard of judicial review does not necessarily determine the outcome of an equal-protection challenge, because the Supreme Court also has acknowledged that "context matters" in evaluating the merits of such a challenge. See Grutter v. Bollinger, 539 U.S. 306, 327 (2003). Thus, depending on the context in which the claim is presented, governmental action may survive even the strictest judicial scrutiny. See id. at 325 (concluding that strict scrutiny was not fatal to a law-school admissions program), Or, it may fail the rational-basis test. See Cleburne Living Ctr., 473 U.S. at 450 (concluding that a zoning ordinance had no rational basis because it was based solely on an irrational prejudice).

Application of the rational-basis test may require extra care in the context of public education, because of "the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child." Plyler, 457 U.S. at 221.  Extra care also may be warranted in this context because, in contrast to the zoning laws at issue in Cleburne, Defendants' actions took place against the backdrop of a very detailed and comprehensive set of statutory requirements that Congress and the states have established for the benefit of disabled students attending public schools.  These statutory requirements make clear that public education of students with disabilities is "a difficult and often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary." Cleburne Living Ctr., 473 U.S. at 442-43.

In many instances, these statutes themselves call for treating disabled students differently than their non-disabled peers, and the Equal Protection Clause should not be treated as an open-ended invitation for courts to rewrite these statutory requirements or to substitute their own policy preferences for those of state and local governments or other branches of the federal government.  I must decline such invitations because the Equal Protection Clause was never intended to make federal courts into "general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking:  a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system." Jennings v. City of Stillwater, 383 F.3d 1199, 1211 (10th Cir. 2004);

accord Cleburne Living Ctr., 473 U.S. at 442-43; Heideman v. Rother, 84 F.3d 1021, 1031 (8th Cir. 1999).

In this case, Plaintiffs contend that Defendants' actions cannot be regarded as "rational" under the Supreme Court's equal-protection jurisprudence if they are in violation the special-education or anti-discrimination statutes enacted by Congress.  In other words, Plaintiffs argue that because the federal statutes establishing certain rights for disabled students were developed against the backdrop of constitutional principles articulated in case law that preceded their enactment, the standard for proving a constitutional violation should be essentially the same as the standard for proving a violation of one or more of these statutes.  [Doc. 160, at 25-26, 30-31.]  Plaintiffs also argue that recent developments in public policy, as reflected in congressional action and the correspondence from the State Department of Education in this case, should be used to determine whether Defendants' actions are supported by a rational basis under the Fourteenth Amendment.

I reject these arguments because they rely on an overly restrictive definition of what it means for governmental action to be "rational."  Plaintiffs' overly restrictive definition leads to an absurd result which conflates Congress' power to enact statutes with the Court's power to interpret the Constitution, and which turns federal courts into "general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking." Jennings, 383 F.3d at 1211.  To read the Equal Protection Clause in a manner that conflates the roles of federal courts with those of state and local governments or other branches of the

federal government is absurd because such a reading would itself violate principles of federalism and separation-of-powers embodied in other provisions of the Constitution.

The special-education and anti-discrimination statutes enacted by Congress do not set the standards for defining which classifications are "rational" under the Fourteenth Amendment because it is the responsibility of the Supreme Court, "not Congress, to define the substance of constitutional guarantees." Garrett, 531 U.S. at 365 (citing City of Boerne v. Flores, 521 U.S. 507, 519-24 (1997)).  And conversely, Congress is not limited to codifying the Supreme Court's existing constitutional jurisprudence when it enacts statutes concerning the public education of individuals with disabilities, because "Congress' power 'to enforce' the [Fourteenth] Amendment includes the authority" to prohibit "a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." Kimel v. Florida Bd. of Regents, 528 U.S. 62, 81 (2000); accord Garrett, 531 U.S. at 365; cf. United States v. Georgia, 126 S. Ct. 877, 882 (2006) (recognizing that there may be conduct that does not violate a person's constitutional rights but may nevertheless be prohibited by Title II of the ADA).

Thus, while constitutional and statutory violations may overlap in some instances, there are other instances in which governmental actions may violate one or more statutes without triggering the Fourteenth Amendment guarantees defined by the Supreme Court's constitutional jurisprudence.  In the words of Justice Kennedy's concurring opinion in Garrett, 531 U.S. at 374, "[t]he failure of a State to revise policies now seen as incorrect

under a new understanding of proper policy does not always constitute the purposeful and intentional action required to make out a violation of the Equal Protection Clause."

Justice Kennedy's words aptly describe the situation presented by the evidence of record in this case. Viewed in the light most favorable to Plaintiffs, this evidence shows that, for many years, some APS officials with the authority to determine school-wide bell schedules thought it permissible to use "instructional time" as the measure of whether the school day for special-education students was equivalent to the school day for regular-education students. Operating under this premise, these officials may have reasoned that it was acceptable to accommodate the right of special-education teachers to have a planning period during the school day, or safety concerns associated with school-bus traffic on the school campus, by altering the bell schedule for special-education students so that an equivalent amount of instructional time was compressed into a shorter overall school day. Although this reasoning may now be rejected under the new and more enlightened understanding of proper policy indicated in the correspondence from APS and the State Board of Education during the 2002-2003 school year, the failure of some APS officials to more promptly revise their practices in accordance with this new understanding does not necessarily reflect the type of irrationality that would violate the Equal Protection Clause.

Under the Supreme Court's equal-protection jurisprudence, the rationality of Defendant's actions is not measured solely by whether they fall under the broader swath of conduct prohibited by Congress in the IDEA or similar statutes. To determine whether the classification Plaintiffs challenge in this case is rational enough to comply with the

Fourteenth Amendment, the Court takes a broader look at whether there is a "'relationship between the disparity of treatment [occasion by this classification] and some legitimate governmental purpose.'" Garrett, 531 U.S. at 367 (quoting Heller v. Doe, 509 U.S. 312, 320 (1993)).   Generally, such a rational relationship is lacking where the classification in question "made no sense," id. at 366 n.4, and could only have resulted from  "an irrational prejudice" Cleburne Living Ctr., 473 U.S. at 450.  "Irrational prejudice," in turn, may encompass wholly improper subjective motives such as "vague, undifferentiated fears," id. at 449,  "ill will," "personal animus," or "sheer malice." Jennings, 383 F.3d at 1211 (citing Bartell v. Aurora Pub. Schs., 263 F.3d 1143, 1149 (10th Cir. 2001)).  It is arguable that such prejudice also may result from sheer "indifference or insecurity." Garrett, 531 U.S. at 374 (Kennedy, J., concurring).  In any case, the burden is on Plaintiffs to present admissible evidence that Defendants' actions resulted from an irrational prejudice or lacked any rational basis.  See Garrett, 531 U.S. at 367.

Plaintiffs fail to meet this burden here.  Unlike the placement of group homes for the mentally retarded that the City of Cleburne sought to regulate by means of its zoning ordinance, the rescheduling of the school day that Plaintiffs seek in this case has a very direct economic and logistical impact on APS's operation of the school system.  In particular, the evidence reflects that such rescheduling impacts Defendants' ability to accommodate planning periods for special-education teachers [Vigil memorandum, Ex. 7 to Doc. 39] and safety concerns arising from school-bus traffic [Ex. C, D to Doc. 105].  One may also infer a more general financial impact, given that the cost-per-pupil of providing the type of special

-24-

education at issue here greatly exceeds the cost-per-pupil of providing regular education. [Hines Aff., Ex. F to Doc. 22.]   Traffic safety, teacher planning, and cost containment all reflect legitimate governmental purposes which may benefit both disabled and non-disabled students, and there is a rational relationship between these purposes and the notion of measuring the length of the school day by means of instructional time.   Thus, Defendants' stated rationale of accommodating different scheduling needs while affording each student the same amount of instructional time is not indicative of an irrational prejudice that makes no sense and can only be attributed to an improper motive such as sheer hostility, contempt, or deliberate indifference toward the disabled.   For these reasons, I conclude that all Defendants are entitled to summary judgment on each Plaintiffs' equal-protection claims.

Because I conclude that Plaintiffs have not come forward with evidence to support a reasonable inference that any Defendant violated the Equal Protection Clause in this case, it is unnecessary to further analyze whether the individual Defendants are entitled to summary judgment on this issue based on the defenses of qualified immunity, lack of personal involvement, or the statute of limitations.   For reasons stated or implied in the Court's prior rulings and in the subsequent discussion of the statute of limitations, these defenses would provide an alternative basis for granting summary judgment in favor of the individual Defendants if such additional analysis were necessary.

## 2.      Plaintiffs' Procedural Due-Process Claims

Plaintiffs also allege that Defendants violated the Due Process Clause of the Fourteenth Amendment because they arrived at their policy of reducing or shortening the

school day for certain categories of special-education students without going through the individualized decision-making framework required under the IDEA.  The Due Process Clause contains both procedural and substantive components.  "Procedural due process ensures the state will not deprive a party of property without engaging fair procedures to reach a decision, while substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision."  Hyde Park Co. v. Santa Fe City Council, 226 F.3d 1207, 1210 (10th Cir. 2000).  In this case, Plaintiffs' focus is on the procedural component of the Due Process Clause.[3]

To determine whether Plaintiffs were denied procedural due process, the Court must answer two questions:  "(1) Did the individual possess a protected interest to which due process protection was applicable?"  and  "(2) Was the individual afforded an appropriate level of process?"  Hennigh v. City of Shawnee, 155 F.3d 1249, 1253 (10th Cir. 1998).  In this case, there is evidence that Plaintiffs have a property interest in receiving a free appropriate public education under the IDEA and similar statutes, and thus I answer the first question in the affirmative.

The Due Process Clause of the Fourteenth Amendment, however, "does not require that each individual receive the procedural guarantees provided for by the instrument which bestows a property interest."  Id. at 1256.  Thus, a violation of the procedural requirements

---

[3]To the extent that Plaintiffs' *Second Amended Complaint* could be construed as asserting a substantive due-process claim based on their asserted property interest in obtaining a free appropriate public education, Defendants would be entitled to summary judgment on that claim for substantially the same reasons previously articulated in the Court's analysis of their equal-protection claims.

of the IDEA or similar statutes does not necessarily amount to a constitutional violation. <u>See</u> <u>id.</u>  While they may inform the determination of whether Plaintiffs have a constitutionally protected property interest, the statutes enacted by Congress or by the States do not set the standards for defining *what process is due* under the Fourteenth Amendment because it is the responsibility of the Supreme Court, "not Congress, to define the substance of [such] constitutional guarantees." <u>Garrett</u>, 531 U.S. at 365 (citing <u>City of Boerne</u>, 521 U.S. at 519-24); <u>cf.</u> <u>Georgia v. Randolph</u>, No. 04-1067, 2006 WL 707380, at *24 (U.S. Mar. 22, 2006) (Scalia, J., dissenting) (noting that changes in the law of property to which the Constitution refers do not necessarily change the meaning of the Constitution itself).

The Supreme Court has recognized that public-school students have a constitutionally protected property interest in avoiding "unfair or mistaken exclusion from the educational process" as a result of individualized determinations of misconduct. <u>Goss v. Lopez</u>, 419 U.S. 565, 579 (1975).  In the context of such individualized, fact-based determinations, the Due Process Clause "entitles students in public schools to be accorded the rudimentary elements of a hearing before they are expelled or suspended for a lengthy or indefinite period, absent some extraordinary situation requiring immediate action before a hearing," <u>Hatch v. Goerke</u>, 502 F.2d 1189, 1195 (10th Cir. 1974).

These authorities are inapposite in this case, however, because Plaintiffs are not asserting that they were removed from their schools based on an individualized, fact-based determination of misconduct.  Rather, the gist of Plaintiffs' *Second Amended Complaint* is that Defendants failed to make such individualized determinations and instead relied on a

series of systemic, school-wide policy decisions to set bell schedules which subjected broad categories of special-education students to a school day that was shorter in its overall duration than that of their regular-education peers.

While the IDEA and other statutes may require otherwise, Defendants need not apply the procedural protections associated with an individualized adjudication to such broad-sweeping policy decisions in order to comply with the Due Process Clause of the Fourteenth Amendment.  "The Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy." Minnesota State Bd. for Community Colleges v. Knight, 465 U.S. 271, 283 (1984) (citing Bi-Metallic Investment Co. v. State Board of Equalization, 239 U.S. 441, 445 (1915)); accord Pro-Eco v. Board of Comm'rs, 57 F.3d 505, 513 (7th Cir.1995); Miles v. Bd. of County Commr's, 1998-NMCA-118, ¶ 8, 125 N.M. 608, 964 P.2d 169; 2 Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 9.2, at 3 (3d ed.1994).  "Not least among the reasons for refusing to recognize such a right is the impossibility of its judicial definition and enforcement.  Both federalism and separation-of-powers concerns would be implicated in the massive intrusion into state and federal policymaking that recognition of the claimed right would entail." Knight, 465 U.S. at 285.

Thus, in circumstances where Defendants were "clearly acting in a rule-making, legislative capacity, the question of notice devolves into whatever is required by statute, not the constitution." Miles, 1998-NMCA-118, ¶ 14.  Regardless of the merits of Plaintiffs' statutory claims, Defendants are entitled to summary judgment on Plaintiffs' constitutional

claims under the Due Process Clause of the Fourteenth Amendment, because there is no constitutional requirement of individualized notice and opportunity to be heard on broad, school-wide policy decisions affecting large numbers of students.

To the extent that Defendants' actions are considered as adjudications rather than rule-making, I also conclude that Defendants are entitled to summary judgment on alternative grounds. With respect to Plaintiffs Janette Barr-Rhoderick and C.J. May, there are undisputed facts which show that Defendants provided all the process that was due under the Fourteenth Amendment. With respect to the Terrazas Plaintiffs, I conclude that their failure to exhaust administrative remedies precludes them from bringing a procedural due-process claim premised on the inadequacy of the individualized IEP process in this action.[4]

Due process is a "flexible" concept that only "calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). In some situations, no pre-deprivation hearing is required, or pre-deprivation procedures can be pared down or abbreviated, so long as "the state provides an adequate post-deprivation remedy." Hamilton v. Myers, 281 F.3d 520, 533 (6th Cir. 2002); see Hennigh v. City of Shawnee, 155 F.3d 1249, 1256 (10th Cir. 1998); Miller v. Campbell County, 945 F.2d 348, 354 (10th Cir. 1991); Powell v. Mikulecky, 891 F.2d 1454, 1458-59 (10th Cir. 1989) (discussing circumstances in which a predeprivation hearing may be limited to oral notice

---

[4]I recognize that exhaustion of administrative remedies may be futile with respect to Plaintiff's statutory claims regarding Defendants' broader policy decision to set bell schedules for special-education students outside of the IEP process; however, that broader policy decision does not support a procedural due-process claim for the reasons previously articulated.

and a brief opportunity to respond at the time the notice is given).  Such situations typically occur where there are exigent circumstances which render pre-deprivation process less feasible.  See Hatch, 502 F.2d at 1195 (acknowledging such "extraordinary situation[s]"); Goss, 419 U.S. at 582 (acknowledging that "there are recurring situations in which prior notice and hearing cannot be insisted upon," as when the student's presence at school "poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process"); Miller , 945 F.2d at 353 ("[W]here the state is confronted with an emergency, it may deprive an individual of his or her property without first providing a hearing.").  And an existing set of procedures set forth in a statute, local ordinance, or collective-bargaining agreement may provide all the post-deprivation process that is due under the Fourteenth Amendment.  See, e.g., Hennigh, 155 F.3d at 1256 (concluding that grievance procedures set forth in a collective-bargaining agreement provided all the post-deprivation process that was due under the Constitution).

The evidence of record in this case reflects that Plaintiff C.J. May's "move to New Mexico was on an emergency basis and it was undisputed that there was a sense of urgency in getting services in place for Student in November 2002."  [Ex. 1 to Doc. 149.]  The evidence of record further reflects that this Plaintiff's school day was not increased to the desired length until after the sixth day of her attendance in the APS system.  As a result, she was dismissed thirty-five minutes earlier than most of the regular-education students on each of those six days.

-30-

While the shortened school day during this brief period may not accord with the substantive requirements of the IDEA or other statutes, this deprivation was not so lengthy or indefinite as to trigger additional procedural protections under the Due Process Clause. Given the emergency nature of her transfer to APS, as well as the availability of post-deprivation procedures under the IDEA, the Due Process Clause did not require a more extensive pre-deprivation hearing during the first week of the student's attendance at APS.

The evidence of record does not reflect that Defendants were sending Plaintiffs home early or requiring them to arrive late without the knowledge of their parent or guardian. To the extent that the parent or guardian was not satisfied with the students' schedule, the IEP process required under the IDEA and similar statutes provided a forum in which disagreements about such scheduling issues could be brought to the attention of school officials and, if necessary, appealed through administrative channels.

With respect to the Terrazas Plaintiffs, the evidence of record also documents that Plaintiff Angelica Terrazas participated in the IEP process which gave her a forum in which to raise whatever concerns she had about the education APS was providing to her son, Plaintiff Astolfo Terrazas. [Terrazas Dep., Ex. A to Doc. 146, at 4-6, 29-30, 60-66.] Although Ms. Terrazas claims in her deposition testimony that this forum was inadequate because APS officials did not provide a satisfactory, individualized explanation for the length of the student's school day, the record reflects that she never exhausted her administrative remedies to challenge the content of the student's IEPs or the position taken by the officials who initially heard her concerns.

-31-

Thus, to the extent the Terrazas Plaintiffs present a procedural due-process claim based on particular defects or inadequacies they experienced when attempting to use the IEP process as a forum for challenging the shortened school day, I conclude that such a claim is precluded by their failure to exhaust  administrative remedies under the IDEA.  The IDEA contains its own set of procedures and requirements for exhaustion of administrative remedies that applies with equal force to related claims under the Constitution or other federal laws which essentially challenge the IEP process itself rather than school policy decisions occurring outside of that process.  See 20 U.S.C. § 1415(*l*); Padilla ex rel. Padilla v. Sch. Dist. No. 1, 233 F.3d 1268, 1274 (10th Cir. 2000) (concluding that exhaustion of the IDEA's administrative procedures and remedies is required  whenever they could redress the plaintiff's alleged injuries "to any degree"); cf. Cudjoe, 297 F.3d at 1066 (concluding that "the IDEA's exhaustion requirement will not be excused simply because a plaintiff requests damages").

Here Plaintiffs cannot have it both ways by claiming to challenge a general policy decision (for which no additional process was due) and then introducing evidence of individualized, fact-based decisions resulting from the IEP process (for which administrative remedies were never exhausted) in order to support the assertion that a more elaborate pre-deprivation hearing was necessary under the Fourteenth Amendment.  If Plaintiffs are going to assert that the IEP process was constitutionally defective, then they must first exhaust the administrative remedies available under that process.  If they are going to limit their challenge to general policy decisions occurring outside the IEP process, then as a matter of

law no additional process was due.  In either case, Plaintiffs' procedural due-process claim under the Fourteenth Amendment is subject to dismissal at this juncture.[5]

Because I conclude that Plaintiffs have not come forward with evidence to support a reasonable inference that any Defendant violated the Due Process Clause in this case, it is unnecessary to further analyze whether the individual Defendants are entitled to summary judgment on this issue based on the defenses of qualified immunity, lack of personal involvement, or the statute of limitations.  For reasons stated or implied in the Court's prior rulings and in the subsequent discussion of the statute of limitations, these defenses would provide an alternative basis for granting summary judgment in favor of the individual Defendants if such additional analysis were necessary.

D. **Plaintiffs' Statutory Claims**

With the dismissal of all of Plaintiffs' constitutional claims, the only claims remaining in this case are those brought against Defendant APS under the IDEA, Section 504 of the Rehabilitation Act, and Title II of the ADA.  Before turning to the different forms of relief that Plaintiffs request under each of these statutory claims, I first consider Defendants' assertion that the duration of such claims is limited by the statute of limitations or the equitable doctrine of laches.

---

[5]To the extent this conclusion is based on a jurisdictional failure to exhaust administrative remedies, the dismissal will be without prejudice for the reasons previously articulated.

### 1.      The Statute of Limitations and the Doctrine of Laches

Until the 2004 amendments to the IDEA went into effect on July 1, 2005, see Pub. L. No. 108-446, 118 Stat. 2715 (2004), none of the statutes at issue in this case expressly provided a limitations period.  Further, the new two-year statute of limitations contained in the 2004 amendments to the IDEA is not binding here, because this litigation precedes the effective date of those amendments.  See  Landgraf v. USI Film Products, 511 U.S. 244, 257 (1994) ("A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at  an earlier date."); cf. INS v. St. Cyr, 533 U.S. 289, 315-17 (2001) (discussing the presumption against retroactive legislation).  For these reasons, the Court relies on other authorities, which generally borrow from state law, to determine what statute of limitations to apply in this context.

Interpreting the provisions of the IDEA in effect prior to the 2004 amendment, this Court previously determined that a three-year statute of limitations was appropriate for claims under the IDEA.  See Sanders v. Santa Fe Pub. Schs., No. Civ. 03-642 MCA/RHS (D.N.M. unpublished memorandum opinion and order filed Nov. 3, 2004).  The Sanders opinion recognized, however, that such judicial determinations must be made on a case-by-case basis considering the particular facts, procedural posture, and legal theories presented. See id. (citing Janzen v. Knox County Bd. of Educ., 790 F.2d 484, 487 (6th Cir. 1986)).

The circumstances of the present case are distinguishable from Sanders in some respects because here Plaintiffs seek certification as a class action, and thus the date of the filing of the class representative's first pleading will toll the limitations period for all

members of the putative class implicated by that pleading unless and until class certification

is denied or the class members opt out.[6]  See Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538,

554 (1974); Joseph v. Q.T. Wiles, 223 F.3d 1155, 1167 (10th Cir. 2000); Realmonte v.

Reeves, 169 F.3d 1280, 1284 (10th Cir. 1999).  In addition, the parties present issues which

go beyond the scope of the Court's analysis in Sanders, because here the IDEA claims are

conjoined with other claims alleging continuing violations of Section 504 of the

Rehabilitation Act, Title II of the ADA, and 42 U.S.C. § 1983.  Thus, the Court must arrive

at a limitations period for Plaintiffs' IDEA claims that is uniform and consistent with the

limitations period for the claims brought under these other statutes.  See Gaona v. Town &

Country Credit, 324 F.3d 1050, 1055-56 (8th Cir. 2003) (collecting cases); cf. Birmingham

v. Omaha Sch. Dist., 220 F.3d 850, 856 (8th Cir. 2000) (applying limitations period for

IDEA claim that is consistent with limitations period under 42 U.S.C. § 1983).

Taking these additional considerations into account, I nevertheless conclude that a

three-year statute of limitations is appropriate in this case for many of the same reasons

articulated in Sanders, No. Civ. 03-642 MCA/RHS, supra.  Although Sanders involved an

administrative appeal under the IDEA, the three-year limitations period that the Court

applied in that case is consistent with New Mexico's statute of limitations for personal-injury

actions, and the applicable state's limitations period for personal-injury actions is typically

---

[6]The limitations period, however, does not necessarily define the scope of the class.  Even if
the putative class members' claims are not time-barred, they must still meet all requirements of Fed.
R. Civ. P. 23 in order to warrant class certification.  The Court defers ruling on those requirements
at this time.

what federal courts borrow to determine the permissible duration of claims under Section 504 of the Rehabilitation Act, Title II of the ADA, and 42 U.S.C. § 1983.  See, e.g., Garcia v. Wilson, 731 F.2d 640, 651 (10th Cir. 1984) (en banc) (applying three-year statute of limitations for personal-injury actions borrowed from N.M. Stat. Ann. § 37-1-8 to civil-rights claims under 42 U.S.C. § 1983), aff'd 471 U.S. 261, 280 (1985);  Baker v. Bd. of Regents of State of Kan., 991 F.2d 628, 631-32 (10th Cir.1993) (reasoning that statute of limitations for personal-injury actions borrowed from state law applies to a claim under Section 504 of the Rehabilitation Act because such a claim is "closely analogous" to a claim under 42 U.S.C. § 1983); Everett v. Cobb County School Dist., 138 F.3d 1407, 1409 (11th Cir.1998) (reasoning that statute of limitations for personal-injury actions borrowed from state law applies to claims under Title II of the ADA and Section 504 of the Rehabilitation Act "[b]ecause causes of action brought under Title II of the ADA and the Rehabilitation Act are essentially identical").  The need for uniformity and consistency therefore weighs in favor of a three-year limitations period in this case.

Because Plaintiffs have pleaded their claims as a class action, however, I  will apply this three-year limitations period in a manner that differs from Sanders in one respect.  In Sanders, the limitations period ran from the filing of the  first  request  for  a  due-process

hearing under the IDEA's administrative procedures.[7]  In this case, it would not be fair to Defendants to run the limitations period for all putative class members from the date that the class representative, Plaintiff Janette Barr-Rhoderick, first filed her request for a due-process hearing at the administrative level.  This administrative request did not provide adequate notice to Defendants or any other putative class members that the matter was going to proceed as a class-action at that time, and the record reflects that other putative class members (such as the Terrazas Plaintiffs) did not pursue their administrative remedies in a similar manner.  See Joseph, 223 F.3d at 1168 (concluding that an earlier version of a pleading did not toll the limitations period for a putative class member because that earlier pleading did not actually represent a class containing that member's claims); Sawtell v. E.I. Du Pont de Nemours and Co., Inc., 22 F.3d 248, 253-54 (10th Cir. 1994) (concluding that earlier class actions filed in Minnesota state courts did not toll the limitations period for a New Mexico plaintiff who was not a member of the Minnesota class).  In this regard, Plaintiffs have acknowledged that APS's procedure for requesting a due-process hearing under the IDEA and state law does not allow for class actions providing system-wide

_____

[7]In cases where a party seeks judicial review of the results of an administrative appeal under the IDEA, there are two different types of acts which may trigger a limitations period.  First, the date on which a party requests a due-process hearing at the administrative level may trigger a limitations period that determines the duration of the conduct which may be challenged in such a hearing and in any administrative appeal that follows from that hearing.  Second, the date of the final administrative decision may trigger another limitations period that determines the deadline by which a party may seek judicial review of that decision.  See generally, Lynn M. Daggett, et al., For Whom the School Bell Tolls but not the Statute of Limitations, 38 U. Mich. J. L. Reform 717, 748-50 (2005).  But neither of these dates is dispositive here, because this case involves a class-action challenge to general policy decisions occurring outside of the individualized administrative procedures contemplated by the IDEA.

injunctive relief at the administrative level.  [Ex. 4, 5 to Doc. 90.]  For these reasons, the three-year limitations period will run from the filing of Plaintiffs' *Class Action Complaint* filed on March 23, 2004, rather than the earlier date of Plaintiff Janette Barr-Rhoderick's administrative request for a due-process hearing on behalf of Plaintiff C.J. May.

This change does not adversely affect Plaintiff C.J. May's remaining claims because she did not enter the APS system until November 2002, which is less than three years before the filing date of the *Class Action Complaint.*  [Doc. 1.]  It does, however, affect the duration of the Terrazas Plaintiffs' remaining claims, because the three-year limitations period only encompasses claims accruing after March 23, 2001, and Plaintiff Astolfo Terrazas was enrolled as an APS student before that date.

To avoid the effect of this three-year statute of limitations, the Terrazas Plaintiffs present two arguments.  First, they argue that their claims did not accrue until after March 23, 2001, because they were never specifically informed of their legal right to challenge the shortened school day until after that date.  This argument fails because "a plaintiff's subjective and correct understanding of her legal rights is not the test for accrual. Otherwise a claim might never accrue and the limitations clock might never start to run."  Weyrick v. New Albany-Floyd County Sch. Corp., No. No. 4:03-CV-0095-DFH-WGH, 2004 WL 3059793, at *12 (S.D. Ind. Dec. 23, 2004); cf. M.D. v. Southington Bd. of Educ., 334 F.3d 217, 224 (2d Cir. 2003) (rejecting an equitable-tolling rule that would permit claims to be brought long after their accrual date based on a failure to inform parents of their legal rights).

In the Tenth Circuit, "claims accrue and '[t]he statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action.'"  Alexander v. State of Oklahoma, 382 F.3d 1206, 1215 (10th Cir. 2004) (quoting Indus. Constructors Corp. v. United States Bureau of Reclamation, 15 F.3d 963, 969 (10th Cir.1994)).  Thus, "[t]he key [to accrual] is knowledge of the injury; ... it does not matter whether the plaintiff realizes that a legal wrong has occurred."  Tolston v. National Railroad Passenger Corp., 102 F.3d 863, 865 (7th Cir.1996).  And "a plaintiff need not have conclusive evidence of the cause of an injury in order to trigger the statute of limitations."  Alexander, 382 F.3d at 1216.  Rather, the Court's  focus is "on whether the plaintiff knew of facts that would put a reasonable person on notice that wrongful conduct caused the harm. In this context, a plaintiff must use reasonable diligence in seeking to discover facts giving rise to a claim for relief."  Id. (citations omitted).

In this case, there is no reason to expect that the students themselves (*i.e.*, Plaintiffs Astolfo Terrazas and C.J. May) were aware that other students were receiving a longer school day, because the nature of their disabilities is likely to have precluded such specific knowledge.  This lack of awareness on the part of the disabled students does not provide a basis for tolling the limitations period, however, because the IDEA's statutory scheme empowers these students' parents or guardians to act on their behalf.  Insofar as the statutory scheme at issue here specifically confers procedural rights on the parents or guardians to act on behalf of their students, it would defeat the goals of this statutory scheme to toll the limitations period based on the students' disability or incapacity alone.  See Strawn v. Mo.

State Bd. of Educ., 210 F.3d 954, 958 (8th Cir. 2000); Alexopulos v. S.F. Unified Sch. Dist.,

817 F.2d 551, 555-56 (9th  Cir. 1987); Lynn M. Daggett *et al.*, For Whom the School Bell

Tolls But Not the Statute of Limitations:  Minors and the Individuals with Disabilities

Education Act, 38 U. Mich. J. L. Ref. 717, 750-53 (2005) (collecting cases).

As for the parents in this case, the evidence of record shows that Plaintiffs Janette

Barr-Rhoderick and Angelica Terrazas had reason to know what times their students were

transported to and from the school campus each day, what the content of their students' IEPs

were, and the timing of the bell schedules which determined the start and dismissal times for

their schools.  With the exercise of reasonable diligence, these Plaintiffs could have inferred

from these facts that the overall length of their students' school day was shortened to less

than that of their regular-education peers based on a policy decision that was not

individualized in the students' IEPs.  The evidence of record does not support a reasonable

inference that Defendants prevented the students' parents or guardians from making such

inferences through concealment or deception.

Accordingly, I conclude that Plaintiffs' claims accrued on the dates that the alleged

violations of the IDEA, ADA, and Section 504 actually occurred.  The accrual dates were

not deferred by the fact that Plaintiffs may have been unaware of their specific legal right to

challenge the school schedule until a later time.

Plaintiffs' second argument for extending the statute of limitations period relies on

the "continuing violations" doctrine recognized by the Supreme Court in Nat'l R.R.

Passenger Corp. v. Morgan, 536 U.S. 101, 118 (2002).  In that case, the Supreme Court's

task was to define what constitutes an "unlawful employment practice" and when such a practice "occurred" within the meaning of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-5(e)(1). See Morgan, 536 U.S. at 109-110. Where a discrete, easily identifiable act amounts to a "unlawful employment practice," as in the case of "termination, failure to promote, denial of transfer, or refusal to hire," the Supreme Court concluded that there is no justification for grouping various acts together as a single, "continuing violation" for purposes of calculating the applicable statute of limitations. Id. at 114.

But Title VII's definition of an "unlawful employment practice" also encompasses claims for a "hostile work environment," which is "composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Id. at 117. The very nature of such claims "involves repeated conduct" that "occurs over a series of days or perhaps years," in which each separate "act of harassment may not be actionable on its own." Id. at 115-16. For these reasons, the Supreme Court found it permissible to treat the various acts which collectively amount to a "hostile work environment" as a "continuing violation" for purposes of calculating the statute of limitations period. Id. at 117.

It follows that the statute of limitations does not bar a "hostile work environment" claim so long as at least one of the acts of harassment contributing to such a claim occurred within the applicable limitations period. In other words, this type of claim may reach conduct which began before the applicable limitations period, because such conduct did not amount to an actionable "unlawful employment practice" under Title VII until it was combined with other conduct occurring after that date.

-41-

There are few reported opinions applying the Supreme Court's reasoning in <u>Morgan</u> to special-education cases under the IDEA or similar statutes, and the few such opinions which do exist have reached varying results.  <u>See</u> <u>SJB v. New York City Dep't of Educ.</u>, No. 03 Civ. 653(NRB), 2004 WL 1586500, at *6-7 (S.D.N.Y. July 14, 2004) (collecting cases). The cases cited by Plaintiffs on this point are readily distinguishable because they predated <u>Morgan</u>, <u>see, e.g.</u>, <u>Jeffrey Y. v. St. Marys Area Sch. Dist.</u>, 967 F. Supp. 852, 85-56 (W.D. Pa. 1997), or because they involved a ruling on a motion to dismiss rather than a motion for summary judgment, <u>see, e.g.</u>, <u>Weyrick</u>, No. 4:03-CV-0095-DFH-WGH, 2004 WL 3059793, at *13 (reasoning that "a statute of limitations provides an affirmative defense" and, therefore, a "plaintiff is not required to negate [such] an affirmative defense in her complaint"); <u>Dobrich v. Walls</u>, 380 F. Supp. 2d 366, 375 (D. De. 2005) (ruling on a motion to dismiss a claim under 42 U.S.C. § 1983 and citing authorities that predate <u>Morgan</u>).

Nevertheless, I agree with Plaintiffs that <u>Morgan</u> has some relevance to their remaining claims in this case.  The first teaching of <u>Morgan</u> is that in order to determine the applicability and scope of the continuing-violations doctrine, one must start with the statutory language that Congress used to define what constitutes an actionable violation. Plaintiffs' *Second Amended Complaint* is not particularly helpful in this regard, because instead of spelling out the particular statutory language that Defendant APS is alleged to have violated on a specific set of dates, Plaintiffs' pleading simply asserts that Defendant APS's "actions" violated the IDEA, Section 504 of the Rehabilitation Act, and Title II of the ADA for more than a decade.  [Doc. 79, at ¶¶ 48, 49, 50.]

Taking into account the supporting averments which accompany these three counts of the *Second Amended Complaint*, it appears that the focus of Plaintiffs' IDEA claims is on the requirement of an individualized IEP, which in turn provides the basis for determining what constitutes a "free appropriate public education" (FAPE) in the "least restrictive environment" (LRE) for a particular student.  See Honig v. Doe, 484 U.S. 305, 311 (1988) (noting that the IEP is "primary vehicle for implementing . . . congressional goals" contained in the IDEA); Hendrick Hudson Cent. Sch. Dist. Bd. of Ed. v. Rowley, 458 U.S. 176, 203-06 (1982) (explaining how the procedural requirements for developing an IEP serve to implement the IDEA's substantive goal of providing an FAPE).  "The IEP must be reviewed and, where necessary, revised at least once a year in order to ensure that local agencies tailor the statutorily required 'free appropriate public education' to each child's unique needs." Honig, 484 U.S. at 311 (citing 20 U.S.C. § 1414(a)(5)).  Thus, an IEP may provide a workable unit for measuring the scope and duration of a claim for deprivation of a "free appropriate public education" in the "least restrictive environment."  Cf. Union Sch. Dist. v. Smith, 15 F.3d 1519, 1526 (9th Cir. 1994) (noting that the procedural requirements for developing an IEP serve to create "a clear record that will do much to eliminate troublesome factual disputes many years later about when placements were offered, what placements were offered, and what additional educational assistance was offered to supplement a placement, if any").

The IEPs for each student also are relevant for purposes of defining the scope and duration of Plaintiffs' claims under Title II of the ADA and Section 504 of the Rehabilitation

Act.  The elements of a claim under these two statutes are essentially the same, "because Congress has directed courts to construe the ADA as giving at least the same amount of protection as the Rehabilitation Act." Swenson v. Lincoln County Sch. Dist. No. 2, 260 F. Supp. 2d 1136, 1144-45 (D. Wyo. 2003) (citations omitted).  In order to state such a claim, "a plaintiff must prove that:  (1) she is a qualified individual with a disability;  (2) she was excluded from the benefits or services of a public entity or otherwise was discriminated against by the public entity;  and (3) such exclusion, denial of benefits, or discrimination was because of her disability.  Id. (citing Gohier v. Enright, 186 F.3d 1216, 1219 (10th Cir.1999)).  Each IEP is relevant to proving the first and third elements of a claim under Title II of the ADA and Section 504 of the Rehabilitation Act because the IEP documents the nature of the student's disability and defines the scope of permissible reasons, if any, why an alleged difference in treatment (such as a shortened school day) does not amount to an unlawful exclusion, denial of benefits, or discrimination based on disability.

Because Plaintiffs are not challenging the validity or appropriateness of the IEPs themselves in this action, they ask the Court to look outside the IEP process for evidence to satisfy the second element, i.e., whether they were excluded from the benefits or services of APS or otherwise were discriminated against by APS.  Insofar as such exclusion or discrimination was not the result of the IEP itself or any day-to-day operational decisions at the school (such as whether illness or behavior issues required an early dismissal on a particular date), one must look to school-wide policy decisions (such as how to set bell schedules for broad categories of students) to determine whether the second element is

satisfied.  As with the IEPs, the evidence of record suggests that the bell schedules were not set on a daily basis, but instead were established on at least an annual basis at the beginning of each school year (or at a definable point during the 2002-2003 school year, in the case of schools that were required to change their bell schedules in order to comply with the memorandum issued by Defendant Hines that year).

For these reasons, the fact that a special-education student received a shortened school day on a particular date is not by itself an actionable violation of the particular provisions of the IDEA, Section 504, or the ADA which are at issue in this case.  Rather, the day-to-day schedule of such students only becomes an actionable violation of the relevant statutory provisions when it is placed in the context of the student's IEP and the general policy decisions occurring outside the IEP process through which "bell schedules" for each school are set.  It is the combination of (1) a decision to implement a shortened bell schedule (2) that is not called for in a student's IEP (3) followed by a series of shortened school days resulting from that bell schedule (and not from other, day-to-day operational causes) which, according to the theories in Plaintiffs' pleading, violates the IDEA, Section 504 of the Rehabilitation Act, and Title II of the ADA in this case.

Because this combination of circumstances is required to establish an actionable violation in this case, the shortened school days at issue here are somewhat akin to the acts which make up a hostile work environment claim; they only become actionable when placed in the framework provided by the students' IEPs and the school's bell schedule.  Thus, under the reasoning of Morgan, it would not make sense to treat each school day that is shortened

under this framework as a discrete statutory violation giving rise to a separate count in Plaintiffs' *Second Amended Complaint* and requiring a separate calculation of the applicable limitations period.

On the other hand, Plaintiffs' claims are discrete in the sense that they can be separated into each school year or calendar year during which an IEP was formulated and a bell schedule was "turned in."  Cf. SJB, No. 03 Civ. 6653(NRB), 2005 WL 1586500, at *8 (concluding that "[t]he defendant's alleged failures to implement different IEPs from different years were each discrete, actionable offenses").  Thus, I do not agree with Plaintiffs' contention that APS's practices at each school during each school year can be reduced to a single, monolithic policy or custom covering every school in the APS system for more than a decade.

The evidence of record does not support Plaintiffs' contention.  Viewed in the light most favorable to Plaintiffs, the evidence of record reflects that APS's bell schedules are determined for each school year on a site-specific basis by principals or other supervisory personnel at each school.  Thus, there are variations in bell schedules from school to school and from year to year.

The IDEA generally requires APS to review and revise IEPs for each special-education student on at least an annual basis, see Honig, 484 U.S. at 311, and the tabulated data compiled by APS during the 2002-2003 school year indicate that there were at least some students for whom a reduced or shortened school day was specifically called for in an IEP.  [Ex. 5 to Doc. 160; Ex. 6 to 161.]  In addition, the portion of Plaintiff Astolfo Terrazas'

IEPs that have been made part of the record at this juncture indicate that for at least one year, his IEP addressed the potential need for a reduced or shortened school day in order to make an "individual bus run."  [Ex. 4 to Doc. 88, at 2.]  Thus, the extent to which the content of an IEP may justify a reduced or shortened school day also may vary from year to year and from student to student.

Plaintiffs point out that inasmuch as Defendant APS failed to offer compensatory education or other prospective relief to remedy the past practice of shortening the school day for certain categories of students, those students may continue to experience the effects of that deprivation long after it occurred.  The existence of such a continuing *injury*, however, is not the same as a continuing *violation*.  In this regard, courts recognize the "important distinction between continuing unlawful acts, and the continuing effects from an earlier unlawful act."  Remigio v. Kelly, No. 04 CIV 1877 JGKMHD, 2005 WL 1950138, at *7 (S.D.N.Y. Aug. 12, 2005).  "[T]he continuing violation doctrine . . . does not apply where a single violation sets in motion merely a continuing injury."  Weyrick, No. 4:03-CV-0095-DFH-WGH, 2004 WL 3059793, at *14.  Thus, Plaintiffs' continuing-injury theory does not provide a basis for tolling the statute of limitations in this case.

For all of the above reasons, I determine that Plaintiffs' remaining claims in this case are best treated as discrete, single-year and single-school violations rather than a long-term, monolithic violation spanning all schools in the APS system for a decade or more.  The specific set of acts which may collectively constitute a discrete, actionable statutory violation is comprised of (1) a series of reduced or shortened school days for one of the designated

-47-

categories of special-education students, (2) that results from a policy decision to set a bell schedule (or other mechanism for determining the overall length of the school day) for a particular school during a particular year, (3) when the IEPs in place for that category of students do not contain individualized justifications for those students to receive a reduced or shortened school day during that year.

Insofar as APS has occasion to review and revise its bell schedules and IEPs on at least an annual basis at the beginning of each school year or calendar year, the effect of this determination is to allow Plaintiffs to reach conduct that occurred during the entire 2000-2001 school year, or at least the entire 2001 calendar year, even though the statute of limitations would otherwise restrict such claims to the period after March 23, 2001. In other words, if the APS bell schedule for the school that Plaintiff Astolfo Terrazas was attending during the 2000-2001 school year was set at the beginning of that school year, and his IEP in place during that entire period did not call for a reduced or shortened school day, then the failure to provide a "full school day" as alleged in Plaintiffs' *Second Amended Complaint* may constitute a single, continuing statutory violation spanning the entire school year during which this Plaintiff was in attendance at that school.

Defendants contend that even if some of Plaintiffs' claims are not barred by the statute of limitations due to the continuing-violations doctrine or other factors, the Court should further restrict their duration by applying the equitable doctrine of laches. "Laches consists of two elements: (1) inexcusable delay in instituting a suit; and (2) resulting prejudice to defendant[s] from such delay." Brunswick Corp. v. Spirit Reel Co., 832 F.2d 513, 523 (10th

Cir. 1987).  Defendants contend that the Terrazas Plaintiffs delay in instituting suit is inexcusable because Ms. Terrazas knew of her son's school schedule and IEPs in the early 1990s [Terrazas Dep., Ex. A to Doc. 146, at 4-6, 28-30, 60-66] and did not seek to join this suit until November 12, 2004.  [Doc. 32].  Defendants further assert that they were prejudiced by this delay because it effectively prevented them from obtaining the testimony of key witnesses  involved in formulating and implementing APS special-education policies in the 1980s and 1990s, and because it dramatically increases the cost and lessens the feasibility of locating or reconstructing educational records concerning what happened to each student at each school several years ago.

For  purposes  of  deciding  the  pending  summary-judgment  motions,  I  find  it unnecessary to further discuss these contentions because I already have weighed the equities occasioned by Plaintiffs' delay in determining whether there are grounds for tolling the statute of limitations.  The statutory scheme under which Plaintiffs claims arise puts an emphasis on resolving disputes between parents and schools quickly through administrative channels rather than allowing such disputes to accumulate and give rise to litigation over many years, during which time the student may have outgrown them.  See Alexopulos, 817 F.2d at 555-56.  On the other hand, the particular dispute at issue here concerns policy decisions that occurred outside the normal IEP process which provides the mechanism for notifying parents of their legal rights and the deadlines for timely asserting those rights. Under these circumstances, I determine that a limitations period of three years extending back to the 2000-2001 school year (or at least the 2001 calendar year) is an equitable result

that prevents Plaintiffs from litigating stale claims in an unfairly prejudicial manner while at the same time affording them a fair opportunity to learn of their legal rights and formulate a litigation strategy for asserting these rights.

### 2.    Damages

Defendants also contend that Plaintiffs are precluded from seeking damages on their remaining claims. Damages are not an available remedy for violations of the IDEA, and the parties have stipulated to the dismissal of Plaintiffs' claims for damages under this statute, as well as any claims for punitive damages arising from a statutory violation. [Doc. 151.] Plaintiffs' only remaining claims for compensatory damages are premised on the alleged violations of Section 504 of the Rehabilitation Act or Title II of the ADA.

In order to obtain compensatory damages under these statutes, a plaintiff must prove that the violation resulted from intentional discrimination. See Powers v. MJB Acquisition Corp., 184 F.3d 1147, 1153 (10th Cir. 1999); Duvall v. County of Kitsap, 260 F.3d 1124, 1138-39 (9th Cir. 2001); Tafoya v. Bobroff, 865 F. Supp. 742, 750-51 (D.N.M. 1994), aff'd, 74 F.3d 1250 (10th Cir. 1996). Such intentional discrimination can be proven by evidence of a personal animosity or ill will toward the disabled, or it may be "inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." Powers, 184 F.3d at 1153. "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." Duvall, 260 F.3d at 1139. And "in order to meet the second element of the deliberate indifference test, a failure

to act must be a result of conduct that is more than negligent, and involves an element of deliberateness." Id.

"Deliberate indifference" may be shown where a government official receives specific and repeated requests to accommodate a particular individual's disability and, after an opportunity to consider and deliberate upon such requests, denies the accommodation without any investigation as to its availability or reasonableness. See, e.g., id. at 1140-41. On the other hand, deliberate indifference is not shown where a governmental agency's delay in effecting system-wide changes occasioned by Title II of the ADA or Section 504 of the Rehabilitation Act is the result of "bureaucratic inertia as well as some lack of knowledge and understanding about" the technical requirements for implementing these statutes. Ferguson v. City of Phoenix, 157 F.3d 668, 675 (9th Cir. 1998).

When viewed in the light most favorable to Plaintiffs, the evidence of record in the present case falls into the category of  negligence or "bureaucratic inertia," rather than "deliberate indifference."  While it is true that some officials in the APS system were first alerted to general policy concerns about shortening the school day in the correspondence from the OCR and the State Department of Education during the 1980s, the exact contours of the statutory mandates at issue in this case had yet to be clearly defined at that time, especially with respect to the technical requirements for how to measure the length of a student's school day.  The OCR's 1984 correspondence with APS references "instructional time" as the measure of the length of a student's school day.  [Ex. I to Doc. 24.]   And other guidance from the OCR during this period is ambiguous with respect to whether the language

of the IEP itself must specify a shortened school day based on counting lunch and recess periods, or whether school officials may infer a justification for a shortened school day based on the IEP's call for instruction on certain skills that are best taught during the lunch or recess periods.  [Letter to Lewis dated Aug. 15, 1986, attached as unnumbered exhibit to Doc. 34.]

In any event, the record reflects that APS did not simply ignore this issue, but instead conducted an investigation and delivered a detailed response to the State Department of Education providing an explanation of how and why they were measuring the length of the school day for certain categories of students.  [Ex. 4 to Doc. 161.]  This explanation may turn out to be flawed or incorrect, but a flawed or incorrect interpretation of an unsettled and evolving area of law does not necessarily amount to deliberate indifference.  If it did, school boards and other local government agencies could never change their policies in response to evolving interpretations of the nation's disability laws without incurring the risk of liability for compensatory damages.  I find it hard to believe that Congress intended to create this kind of disincentive for such voluntary and enlightened policy changes.

The reported cases in which courts have allowed or awarded damages based on "deliberate indifference" in this context involve the denial of a particular individual's specific and repeated requests to accommodate a disability, rather than more generalized, inter-agency policy discussions about how best to interpret or implement statutory mandates across an entire system.  In this case, there is evidence that APS officials began receiving individual complaints about shortened school days for particular APS students during the

2002-2003 school year. [Hines Aff., Ex. A to Doc. 49.] In response to such individual complaints, APS officials conducted an investigation and took corrective action, as evidenced by Defendant Hines' correspondence to each APS school principal dated November 8, 2002 [Ex. G to Doc. No. 22], and Dr. Evans' audit of each school's compliance with the instructions given in that correspondence [Evans Dep., Ex. 12, at 17-25; Evans Aff., Ex. B to Doc. 98].

In the case of Plaintiff C.J. May, who began attending APS in November 2002 as a result of an emergency transfer from another state, the corrective action occurred after the student's sixth day of attendance. There is no reasonable basis for concluding that flaws or mistakes in calculating or documenting the justification for the length of the school day that occur in the course of effecting an emergency transfer of this nature can amount to deliberate indifference when they are corrected within six school days.[8]

When viewed in the light most favorable to Plaintiffs, the evidence of record reflects that it may have taken longer to correct the bell schedules at other APS schools during the 2002-2003 school year, or to make individualized determinations regarding a shortened school day in the IEPs for particular students at those schools. Moreover, there was nothing

---

[8]I note that the Due Process Hearing Officer reached a different conclusion with respect to Plaintiff C.J. May; however, the evidence of record before this Court does not reflect that such a conclusion was affirmed by the Administrative Appeal Officer. [Ex. 4, 5 to Doc. 90.] In any event, Plaintiffs have failed to come forward with more complete evidence from the administrative record in Plaintiff C.J. May's case that would justify the Due Process Hearing Officer's conclusion in this regard, and it appears that such a conclusion was mere *obiter dictum* in the administrative proceedings because awarding damages for a general policy of intentional discrimination was beyond the scope of those proceedings.

that necessarily prevented APS officials with the requisite policymaking authority from requiring the principals of these schools to revise their bell schedules *before* they began receiving individual complaints during the 2002-2003 school year.  And, as Plaintiffs point out, Defendants did not immediately offer them compensatory education as a remedy for any past mistakes recognized in the policy changes that occurred during the 2002-2003 school year when Defendant Hines issued her memorandum and Dr. Evans performed his audit.

I conclude that such failures to act sooner, however negligent, lack the element of deliberateness necessary to sustain a claim for compensatory damages in this context.  As with the changes to the city telephone system at issue in Ferguson, 157 F.3d at 675, there is a certain "bureaucratic inertia" inherent in recognizing the need for, and then implementing, broad-sweeping changes across a large, decentralized school system in which scheduling decisions are typically made by each school and, in some cases, on a student-by-student basis.  Even when viewed in the light most favorable to Plaintiffs, the evidence of such negligence or "bureaucratic inertia" does not amount to deliberate indifference in this case.

Defendants point out that when implementing the policy changes during the 2002-2003 school year, they could not simply extend a general, blanket offer of compensatory education for all students previously affected by a shortened school day, because such a general offer would itself violate the very requirements of individualized decisionmaking for each student that Plaintiffs claim to be championing in this cause.  I agree with Defendants that a determination of the extent to which the past practice of shortening the school day warrants compensatory education must be specifically tailored through the IEP process for

each student and cannot be reduced to a simple, hour-for-hour formula that Defendants could be expected to apply immediately in a blanket offer to all affected students.  See Reid v. District of Columbia, 401 F.3d 516, 523-24 (D.C. Cir. 2005).  The undisputed facts and evidence of record reflect different circumstances relevant to each Plaintiff which support this conclusion.

The evidence of record pertaining to Plaintiff C.J. May, for example, indicates that while attending middle school in November 2002, she was subjected to a total of six school days where her attendance on the school campus was thirty-five minutes shorter than that of her regular-education peers.  The Administrative Appeal Officer (AAO) who heard her administrative appeal under the IDEA concluded that she was not entitled to compensatory education for the thirty-five minutes of school attendance of which she was deprived during her first six school days in November 2002, but awarded compensatory education based on issues other than the length of the school day.  [Doc. 79, ¶ 30.]  And while the parties now seek judicial review of that decision (including the award of compensatory education), it remains the student's current educational placement while this matter is pending.  See 20 U.S.C. § 1415(j).

The parents of Plaintiff Astolfo Terrazas never requested a due-process hearing regarding the issue of a shortened school day, and thus there is no administrative record for the Court to review in his case.  The record does, however, reflect that per his parents' request, this Plaintiff had stopped attending school at an APS campus with a bell schedule for regular-education students by the time he became a plaintiff in this action in 2005, and

at that time he was nearing the age at which his presumptive eligibility for public education would cease.  [Ex. 2, 8 to Doc. 88; Doc. 61.]

On this record, I conclude that Plaintiffs have not met their burden of showing a genuine issue of material fact which could support a reasonable inference that Defendants acted with the kind of discriminatory intent, or deliberate indifference, necessary to support a claim for compensatory damages under Section 504 of the Rehabilitation Act or Title II of the ADA.  As previously noted in the discussion of Plaintiffs' equal-protection claims, the evidence of record does not reflect a personal animosity or ill will toward any particular category of disabled students, nor does it reflect a deliberate effort to provide special-education students with less public education than their regular-education peers.  Rather, this evidence shows, at best, that Defendants were operating under a mistaken premise as to how to measure the length of the school day for certain categories of special-education students, and when this mistake was brought to their attention, they made efforts to correct it.  Viewing the evidence in the light most favorable to Plaintiffs, the delay in recognizing and correcting this mistake might be characterized as negligent or otherwise unlawful, but it does not amount to a showing of deliberate indifference.

### 3.   **Declaratory and Injunctive Relief**

The above discussion of Plaintiffs' claims for compensatory damages does not preclude them from seeking compensatory education or other equitable relief in this action, nor does it preclude them from seeking a declaratory judgment for the purpose of providing a definitive answer to the question of how to measure the length of a special-education

student's school day in comparison to his or her regular-education peers.  As indicated in the Court's previous *Memorandum Opinion and Order* [Doc. 121] addressing Plaintiffs' standing to pursue such declaratory and equitable relief, I do not agree that this question has been entirely put to rest by Defendants' apparent change of policy during the 2002-2003 school year.  Since that *Memorandum Opinion and Order* was issued, Defendants still appear to cling to the possibility that their earlier policy of automatically counting lunch, recess, and passing periods as "instructional time" for certain categories of students (as suggested in the correspondence from the OCR during the mid-1980s) might remain a legally viable option to which they may return some day.  Thus, there is still a live controversy as to this legal question, which a declaratory judgment may conclusively resolve.

Similarly, the question of equitable relief remains an open question when the evidence of record is viewed in the light most favorable to Plaintiffs.  While Defendants are probably correct that it would not accord with the IDEA for this Court to award compensatory education by means of a simple, hour-for-hour formula that does not take into account each Plaintiff's individual educational needs, see Reid, 401 F.3d at 523-24, the equities may nevertheless weigh in favor of some other form of relief that is more procedural in nature. See Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction" is "to do equity and to mould each decree to the necessities of the particular case.  Flexibility rather than rigidity has distinguished it.").

If, for example, Plaintiffs were to present a specific calculation of the time lost to a particular student due to an unlawfully shortened school day that occurred outside the IEP

process and had not yet given rise to a due-process hearing under the IDEA, Defendants have not shown why the law would prohibit the Court from requiring that calculation to be submitted to the student's IEP team with instructions to make an initial determination of whether, to what extent, and in what form that student is entitled to compensatory education for such lost time.[9]  Similarly, Defendants have not shown why the Court could not impose a procedural requirement in such cases to specifically notify each affected person (whether parent, guardian, or student) of their right to have that issue addressed by the IEP team and to challenge the IEP team's resolution of that issue by means of a due-process hearing.

For these reasons, and the reasons stated in the Court's prior rulings, I conclude that there remain disputed issues of material fact which preclude summary judgment in Defendant APS's favor with respect to Plaintiffs' statutory claims for declaratory and equitable relief from the 2000-2001 school year forward.  Therefore, Defendant APS's motion for summary judgment is denied in part with respect to those claims only.

It does not necessarily follow that Plaintiffs are entitled to summary judgment on any aspect of these remaining claims (including those pertaining to the 2002-2003 school year). The standard for granting summary judgment presents a higher hurdle when the movant is also the party bearing the burden of proof, because in that instance the movant must show that the record as a whole satisfies each essential element of his or her case and negates any

---

[9]Such a remedy would not apply to Plaintiff C.J. May or other students who already have exhausted their administrative remedies, for the Court cannot delegate to the IEP team the task of determining whether such administrative remedies are correct.  See Reid, 401 F.3d at 526-27.

affirmative defenses in such a way that no rational trier of fact could find for the non-moving party.  See 19 Solid Waste Dep't Mechanics, 156 F.3d at 1071; Newell, 912 F.2d at 795; Gagel, 815 F. Supp. at 391.

In this case, the essential elements of Plaintiffs' remaining claims are somewhat complex because, as discussed above, Plaintiffs are alleging continuing violations over the course of several school years that stem from policy decisions occurring outside the IEP process.  Such a continuing violation essentially involves proof of (1) a series of reduced or shortened school days for one of the designated categories of special-education students, (2) that results from a policy decision to set bell schedules for a particular school during a particular year that differentiate between regular-education students and special-education students with respect to the overall length of the school day, (3) when the IEPs in place for that category of students do not contain individualized justifications for those students to receive a reduced or shortened school day during that year.

With regard to the third element, Plaintiffs attempt to shift the burden onto Defendant APS to review each IEP and bring to the Court's attention any IEPs that specifically call for a shortened school day.  While Defendant APS may be obliged under the Court's discovery rulings to make certain IEPs in the school district's possession available for Plaintiffs' review, I do not agree that Defendant APS bears the ultimate burden of proving the content

of each IEP under the view of the law articulated above.[10]

Accordingly, I conclude that in order to meet their burden of proof for each school year constituting a discrete violation, Plaintiffs must organize and present evidence setting forth (1) the specific dates and content of the student's IEP(s) for that school year, (2) the specific date(s) on which a bell schedule not expressly mentioned in the student's IEP(s) was set for the school where the student attended that year, (3) the specific amount of time that the student's school day was shortened in comparison to regular-education students as a result of that bell schedule, and (4) the number of school days during that year on which the student was subjected to such a shortened school day.

The only student for whom Plaintiffs come close to meeting this burden is Plaintiff C.J. May, whose school day was shortened by thirty-five minutes on six days in November 2002.  But the Court still lacks a complete administrative record for this student's due-process hearing and administrative appeal, or even a complete copy of the decisions of the Due Process Hearing Officer and the Administrative Appeal Officer resulting from those proceedings.[11]  These materials are not attached to Plaintiffs' consolidated motion.  Instead,

---

[10]This conclusion does not rule out the possibility that it might be more cost-effective, in the long run, for Defendant APS to make some effort to assist Plaintiffs in completing their review of the relevant IEPs.  As a matter of professionalism, attorneys should strive to cooperate in reducing the costs of litigation even when the substantive law does not expressly require them to do so.  See A Creed of Professionalism of the New Mexico Bench and Bar (2005).

[11]The Court's earlier decision to excuse the Terrazas Plaintiffs' from the requirement of exhausting their administrative remedies with respect to their remaining claims does not necessarily obviate the need to produce the administrative record for Plaintiff C.J. May's claims.  The Court previously noted that this administrative record may be necessary to frame the matter for judicial review, at least as to claims for which Plaintiffs bear the burden of proof.  [Doc. 121, at 20-21.]

Plaintiffs' evidence is scattered among a hodgepodge of fragmentary, piecemeal filings that makes the Court's task akin to that of the proverbial pig "hunting for truffles buried in briefs"-- a metaphor that appellate courts commonly use in explaining the need for parties to marshal their evidence with specific and complete citations to the record.  See, e.g., Roska v. Peterson, 328 F.3d 1230, 1246 n.13 (10th Cir. 2003); FDIC v. Schuchmann, 235 F.3d 1217, 1230 n.11 (10th Cir. 2000).  Given that Plaintiffs bear the burden of proof on all their remaining claims, this fragmentary record does not provide adequate grounds for granting summary judgment in their favor.

## III.   CONCLUSION

For the foregoing reasons, the Court determines that all Defendants are entitled to summary judgment on Plaintiffs' constitutional claims under 42 U.S.C.§ 1983 and that Defendant APS is entitled to partial summary judgment limiting the scope and duration of Plaintiffs' statutory claims under the IDEA, Section 504 of the Rehabilitation Act, and Title II of the ADA.  In addition, Plaintiffs have not shown that they are entitled to partial summary judgment on their remaining statutory claims, and there is no basis to amend or alter the Court's prior rulings in this matter.  The result is that Plaintiffs' statutory claims against Defendant APS for declaratory and equitable relief from the 2000-2001 school year forward are the only remaining claims in this action.

**IT IS THEREFORE ORDERED** that *Individual Defendants' Motion for Summary Judgment* [Doc. 145] is **GRANTED**.

     **IT IS FURTHER ORDERED** that *Defendant APS' Motion for Summary Judgment* [Doc. 147] is **GRANTED IN PART** with respect to Plaintiffs' constitutional claims, Plaintiffs' statutory claims for damages, and Plaintiffs' claims that predate the 2000-2001 school year.

     **IT IS FURTHER ORDERED** that *Defendant APS' Motion for Summary Judgment* [Doc. 147] is **DENIED IN PART** with respect to Plaintiffs' statutory claims for declaratory and equitable relief from the 2000-2001 school year forward.

     **IT IS FURTHER ORDERED** that *Plaintiffs' Consolidated Motions 1) for Partial Summary Judgment Against Defendant APS and 2) to Alter or Amend Order of Partial Summary Judgment for Defendant APS* [Doc. 149] are **DENIED**.

     **IT IS FURTHER ORDERED** that all remaining claims against Defendants Beth Everitt, Debi Hines, Nancy Kilpatrick, and Ron Williams are **DISMISSED** from this action, and the caption shall be amended accordingly.

     **SO ORDERED** this 3rd day of April, 2006, in Albuquerque, New Mexico.

                                 **M. CHRISTINA ARMIJO**
                                 UNITED STATES DISTRICT JUDGE